# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-0827V

|  |  |
|---|---|
| NEYTON COLINDRES,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: October 27, 2025 |

*Maximillian J. Muller*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Ryan Daniel Pyles*, U.S. Department of Justice, Washington, DC, for Respondent.

## **DECISION AWARDING DAMAGES**[1]

On June 6, 2023, Neyton Colindres filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that he suffered from Guillain-Barré syndrome ("GBS"), a Table injury, as a result of an influenza ("flu") vaccine received on February 1, 2022. Petition at 1. The case was assigned to the Office of Special Masters' Special Processing Unit (the "SPU").

Respondent conceded that Petitioner should be compensated for a Table flu/GBS injury in November 2024, but the parties were unable to resolve damages, so I ordered briefing on the matter. Scheduling Order entered Nov. 8, 2024 (ECF No. 31); Brief filed

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Jan. 7, 2025, ECF No. 33 (seeking $160,000.00 for past pain and suffering); Response filed Mar. 24, 2025, ECF No. 36 (advocating for a lesser award of $100,000.00); Reply filed Apr. 23, 2025, ECF No. 37. **For the reasons set forth below, I award $160,000.00 for Petitioner's past pain and suffering.**

## I.  Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I – II of *Congdon v. Sec'y of Health & Hum. Servs.*, No. 23-2025V, 2025 WL 2734068, at *1 – 4 (Fed. Cl. Spec. Mstr. Aug. 21, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## II.  Fact Record[4]

Petitioner Neyton Colindres was 48 years old at the time of the relevant vaccination (which occurred on February 1, 2022). His medical history included obesity and high blood pressure, and he was enrolled in Medicaid. Ex. 2 at 130-31; Ex. 1 at 8.

Nineteen (19) days later (February 20, 2022), at a local emergency room, Petitioner sought evaluation of new symptoms including generalized "body aches" at a local emergency room. Ex. 3 at 21. After an EKG's findings were unremarkable, he was tentatively assessed with an unspecified viral infection, for which he was prescribed ibuprofen for use at home. *Id.* At 23. A February 22, 2022 primary care evaluation was similarly inconclusive, but the treater changed his pain medication. Ex. 2 at 6-9.

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[4] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as all arguments presented by both parties.

On February 23, 2022, Petitioner sought another emergency evaluation for pain in his arms, neck, and back; difficulty walking (ataxia); difficulty swallowing (dysphagia); difficulty speaking; and facial droop. Ex. 4 at 8. Viral testing; bloodwork; a chest x-ray; multiple CT scans; and EKG findings were largely unremarkable. *Id.* at 8-12. But MRIs found cervical spine "mild disc and facet degeneration," and lumbar spine multilevel spondylosis and stenosis particularly at the right L5 nerve root (with "moderate" impacts on the *left* side of the body). *Id.* at 73-74, 77-78. He was initially admitted to rule out a heart attack or stroke. *Id.* at 19.

On February 24, 2022, a neurologist documented that Petitioner had significant facial weakness with weak eyelid closure and Bell's phenomenon bilaterally; a weak smile; could not puff cheeks; and tongue midline with some weakness on lateral movements. Ex. 4 at 28. His motor strength was generally 4/5; sensation was diminished; and deep tendon reflexes ("DTRs") were absent at the patellar and Achilles, and trace at the biceps and brachioradialis. Petitioner denied any pain, however. *Id.* at 29 ("no neck or back pain"). A lumbar puncture performed later that day without complication and revealed elevated protein. *Id.* at 29, 51, 75-76. On February 25, 2022, an infectious disease specialist suggested that Petitioner might have suffered GBS "secondary to the flu vaccine," and supported a 5-day course of IVIg. *Id.* at 31-36.

Petitioner also suffered an episode of "acute hypoxic respiratory failure" which improved with supplemental oxygen through nasal tubes. Multiple records described his respiratory status as stable, and he was not transferred to intensive care, but a subsequent chest CT scan was "concerning for pneumonia…" Ex. 4 at 17-19. The hospital course also included a pureed food diet, swallow study, inpatient therapy, and a urinary catheter. (Apart from the aforementioned IVIg treatments), Petitioner's only medications were a diuretic, a laxative, lisinopril and amlodipine (for his pre-existing high blood pressure), and artificial tears (for the new facial palsy with eye drooping). *Id.* at 19-20.

At the end of his 12-day hospitalization, on March 6, 2022, Petitioner displayed "difficulty opening his eyelids… significant motor weakness in the lower extremit[ies], improving strength in the upper extremit[ies] right more than left, absent reflexes in the lower extremities." Ex. 4 at 19. His health insurance (Medicaid) denied the hospitalists' recommendation of acute inpatient rehabilitation at a skilled nursing facility, in favor of an ambulance transport and home health services. *Id.* During March 2022 at his home, Petitioner had four skilled nursing sessions, seven physical therapy ("PT") sessions, and nine occupational therapy ("OT") sessions. He had ongoing shortness of breath; difficulty swallowing and pureed diet; and decreased strength, coordination, and endurance. He was using an electrical hospital bed with side rails, Hoyer lift, and a wheelchair, with his wife and children's assistance for all activities of daily living. His pain rating was 0/10. *See*

*generally* Ex. 6. The home health services ended prematurely due to a Medicaid coverage change, at the end of March 2022. Ex. 6 at 61; Ex. 11 at 6.

At a March 29, 2022 initial consult, internist Robert Cons, M.D., prescribed alprazolam (Xanax) for Petitioner's reported anxiety since his acute GBS and hospitalization. Ex. 7 at 3, 6, 11. Dr. Cons listed additional concerns (e.g., weakness, impaired speech, memory loss, myalgia, and impaired speech articulation), without any corresponding exam findings or treatment plan. Instead, Dr. Cons instructed Petitioner to consult other providers for those concerns. *Id.* at 5-6.

On April 14, 2022, Petitioner established care at a county health clinic. Petitioner's new primary care physician ("PCP") recorded that he was maximally dependent for all activities of daily living ("ADLs"), except eating and grooming which required minimal assistance. He could ambulate with a walker at home, but he had ongoing fatigue and weakness particularly in his legs, making him wheelchair-bound outside the home. He intermittently required supplemental oxygen, and he was unable to fully close his eyes (requiring taping/patching e.g., to sleep). Ex. 5 at 7. *Id.* The PCP ordered a second course of home-based PT. Ex. 5 at 8; Ex. 11 at 5.

The April 19, 2022 PT record documents back pain reaching 5/10 (controlled with unspecified, presumably over-the-counter pain medications); weakness in all extremities; poor mobility and balance; reliance on a wheelchair or walker; and inability to leave the house unassisted. Ex. 11 at 13. On May 13, 2022 (after roughly eight formal PT sessions), he was discharged having met his goals of pain reduction (to 3/10) and improved (but not full) function. *Id.* at 12, 21.

On June 15, 2022, the PCP recorded that Petitioner was moving short distances with a cane but longer distances in a wheelchair. Ex. 5 at 10. A limited physical exam recorded 5/5 motor strength in the upper extremities, and 4+/5 in the lower extremities. *Id.* Petitioner's depression and anxiety score was 0, and he reported "lately no longer taking" Xanax. *Id.* at 11-12. A neurology referral was placed. *Id.* at 12.[5]

On September 1, 2022, again at the county health clinic, Petitioner attended his first-ever post-GBS outpatient neurology evaluation. Ex. 5 at 12. He felt that his "strength ha[d] recovered to 80% of baseline," and no pain was documented. But he had residual left-sided facial numbness and weakness; mild deficits in sensation, strength, reflexes,

---

[5] Additionally, the PCP's record carried over or repeated the plan for home-based PT – but Petitioner had *completed* that PT, having met all goals, the previous month. *Compare* Ex. 5 at 11; Ex. 11 at 12, 21.

4

and balance; a "slightly ataxic gait"[6] and reliance on a cane. *Id.* at 12-13. Assessing that Petitioner had "significant[ly] recover[ed]" from GBS, the neurologist did not offer any additional treatment. *Id.* at 13.

At a January 5, 2023 follow-up, the neurologist recorded that Petitioner's facial symptoms and weakness continued to improve, but he had developed new back pain upon trying to lift weights. Ex. 5 at 1. He now displayed a "slightly antalgic[7] gait" while walking with a cane. *Id.* at 2. The neurologist agreed to obtain an EMG "to quantify level of residual recovery" from GBS, while also assessing Petitioner with a likely back strain and/or mild radiculopathy, which could warrant a future MRI of the lumbar spine. *Id.*[8]

At the next and last-documented neurology follow-up (July 6, 2023), Petitioner reported feeling well, getting a cramp in his right foot/leg sometimes especially at work (in construction), but no symptoms in his hands and no back pain. Ex. 12 at 15. The exam still found "subtle… residual weakness," but full strength, improved reflexes, and normal gait. *Id.* at 15-16. A recent EMG was normal except for bilateral median neuropathy (in the wrists) which could be attributable to either carpal tunnel syndrome or past GBS. *Id.* at 16. The EMG found no evidence for lumbosacral radiculopathy, but the neurologist referred to past "radiculopathy symptoms" and did not clearly discuss those versus GBS residuals. *Id.* Overall, the neurologist "reassured [Petitioner] that he has recovered very well from his GBS," and only planned for Petitioner to "kee[p] his emotional support pet given his emotional support pet given his traumatic experience with having GBS." *Id.*; *see also* Ex. 12 at 10 (August 2023 primary care record confirming that Petitioner was "ambulating without assistive devices").

Petitioner's sworn statement (at Ex. 13) further details his GBS pain and suffering, including how the facial palsy and hypoxia prevented him from communicating during the

---

[6] An ataxic gait is defined as "an unsteady, uncoordinated walk, with a wide base and the feet thrown out, due to some form of ataxia." Dorland's Medical Dictionary Online (hereinafter "Dorland's"), *Ataxic Gait,* https://www.dorlandsonline.com/dorland/definition?id=77913&searchterm=ataxic%20gait (last accessed Oct. 23, 2025).

Ataxia is defined as "failure of muscular coordination; irregularity of muscular action." Dorland's, *Ataxia,* https://www.dorlandsonline.com/dorland/definition?id=4630&searchterm=ataxia (last accessed Oct. 23, 2025).

[7] Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's, *Antalgic,* https://www.dorlandsonline.com/dorland/definition?id=3131&searchterm=antalgic (last accessed Oct. 23, 2025).

[8] This outpatient neurologist did not address the previous year's MRIs finding degenerative changes in the lumbar and cervical spine, *see* Ex. 4 at 73-74, 77-78.

5

acute course and increased his dependence on his wife, children, and medical providers. Petitioner also discusses his insurance's denial of inpatient rehabilitation services; the difficulty of recovering at home instead; and he reports secondary back pain.[9] He describes a diligent home exercise program, including swimming; his return to work (in construction, according to the medical records); and somewhat improved mental health; but ongoing pain in his lower back and right leg; general weakness; and facial nerve symptoms.[10]

### III.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The parties agree, and my own review of the evidence confirms, that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

In short, the medical record evidence reflects a fairly familiar course of GBS (beginning in February 2022), involving alarming and painful new neurological symptoms that were misconstrued at the first two medical encounters. Afterwards, a 12-day inpatient hospitalization involved a lumbar puncture (among various other diagnostic tests and evaluations); the recognition of GBS, and IVIg treatment. But in addition, Petitioner suffered aggravated hypertension, and acute hypoxic respiratory failure – requiring supplemental oxygen, and his GBS included a facial palsy – causing acute speech and eating difficulties, and longer-term impacts on his vision and appearance. I also note that Medicaid did not approve the recommended inpatient rehabilitation stay, and limited the extent of outpatient therapy (28 sessions, when counting all skilled nursing, OT, and PT). Petitioner was forced to rely on his wife and children at home, and he was temporarily out

---

[9] Petitioner avers that as he was recovering from GBS, he suffered from "kyphosis." Ex. 13 at ¶ 21. Kyphosis generally refers to curvature of the spine. *See* Dorland's, *Kyphosis*, https://www.dorlandsonline.com/dorland/definition?id=27290&searchterm=kyphosis (last accessed Oct. 23, 2025). From my review of the medical records, Petitioner was not formally diagnosed with kyphosis and that may not be an accurate descriptor of his back pain.

[10] Petitioner also stated (in September 2024) that his neurologist had ordered additional occupational and/or physical therapies for his residual symptoms. Ex. 13 at ¶ 24. However, that is not corroborated by the records filed.

of work. There is also some evidence that his GBS contributed to new anxiety and back pain (but the latter was at least partially explained by preexisting cervical radiculopathy). His last actual treatment was the PT ending in mid-May 2022 – roughly three months post-onset. The subsequent primary care and neurology appointments document a substantial recovery and an apparent return to construction work, but *some* residual symptoms (e.g., the decreased endurance typical with GBS, and also facial numbness and weakness) until roughly seventeen (17) months post-onset. Finally, Petitioner's renewed complaints of back pain were not clearly explained as being due to GBS, rather than his preexisting degenerative changes.

Upon agreeing to formally adjudicate the appropriate award of pain and suffering (based on the parties' reported impasse), I requested each party's position based on the case-specific facts and "comparison to past reasoned opinions on GBS damages in the Vaccine Program." Scheduling Order entered Nov. 8, 2024 (ECF No. 31) (internal citation to a previous version of GBS pain and suffering statistics omitted).

Petitioner requests a past pain and suffering award of $160,000.00. He followed my instruction – specifically reviewing the facts in his case and those of six previous reasoned opinions. *See generally* Brief (ECF No. 33).[11] He particularly emphasizes the *Robinson*, *Weil*, and *Maxwell* cases, and suggests that his longer hospitalization, need for supplemental oxygen, and residual symptoms warrant an equivalent if not higher award. *Id.* at 10-11.

In contrast, Respondent maintains that his proffer of $100,000.00 is sufficient and fair for a case that "demonstrates marked improvement within about half a year, with effective recovery within one year," and would be "consistent with previously proffered flu/GBS cases." Response at 7. But Respondent also "recognizes that awards of pain and suffering are discretionary, and **the cases cited by Petitioner, all presided over by the Chief Special Master, are comparable to the current case."** *Id.* (emphasis added). On reply, Petitioner emphasizes that Respondent has not tried to distinguish the past case law or seriously argue against his demand for $160,000.00. Reply at 2.

---

[11] Citing *Gruba v. Sec'y of Health & Hum. Servs.*, No. 19-1157V, 2021 WL 1925630 (Fed. Cl. Spec. Mstr. Apr. 13, 2021) (awarding $165,000.00 for past pain and suffering); *Gross v. Sec'y of Health & Hum. Servs.*, No. 21-835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021) ($160,000.00); *Robinson v. Sec'y of Health & Hum. Servs.*, No. 18-0088V, 2020 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 27, 2020) ($160,000.00); *W.B. v. Sec'y of Health & Hum. Servs.*, No. 18-634V, 2020 WL 5509686 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) ($155,000.00); *Weil v. Sec'y of Health & Hum. Servs.*, No. 21-0831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Feb. 6, 2023) ($140,000.00); *Maxwell v. Sec'y of Health & Hum. Servs.*, No. 21-1877V, 2024 WL 1343007 (Fed. Cl. Spec. Mstr. Feb. 27, 2024) ($140,000.00).

After reviewing all of the evidence, both parties' briefing, and the past reasoned opinions cited by Petitioner, I conclude that he has adequately supported his request for a past pain and suffering award of $160,000.00, over Respondent's lower proffered sum. That figure is therefore awarded.

## Conclusion

**I hereby award Petitioner the following:**

**A. A lump sum payment of $160,000.00 (for past pain and suffering[12]) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

**B. A lump sum payment of $33,164.44, representing compensation for satisfaction of the State of California Medicaid lien, in the form of a check payable jointly to Petitioner and:**

**State of California - Department of Health Care Services
Recovery Section, MS4720
P.O. Box 997425
Sacramento, CA 95899-7425
DHCS Account Number: C95900253D-001**

**Petitioner shall endorse and forward the check to the above recipient for satisfaction of the Medicaid lien.[13]**

These amounts represent compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**                    **s/Brian H. Corcoran**
                                         Brian H. Corcoran
                                         Chief Special Master

---

[12] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[13] *See* Response at 1 (concurring that reimbursement of the lien documented in Petitioner's Exhibit 14 is properly compensable).

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.